**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------x
:
SELVIN LABORIEL, :
                              Plaintiff, :
                  -against- :                    No. 18-CV-5294 (KPF) (OTW)
:
:                    <u>**REPORT & RECOMMENDATION**</u>
:
:
ANDREW M. SAUL, Commissioner :
of Social Security,[1] :
                              Defendant. :
:
----------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

**TO THE HONORABLE KATHERINE POLK FAILLA, United States District Judge,**

**I.**    <u>**Introduction**</u>

Plaintiff brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C.

§405(g), seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner") denying his application for supplemental security income ("SSI"). Both parties

have filed competing Motions for Judgment on the Pleadings. (ECF 15, 21). For the reasons set

forth below, I recommend that Plaintiff's Motion for Judgment on the Pleadings be **GRANTED**,

and that the Commissioner's Motion for Judgment on the Pleadings be **DENIED**, and that the

case be remanded for further proceedings pursuant to 42 U.S.C. § 405(g).

---

[1] Andrew M. Saul is now the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Andrew M. Saul for former Acting Commissioner Nancy A. Berryhill.

II. **Statement of Facts**

A. **Background**

Plaintiff is a 25-year-old male, who was 17 months old at his alleged disability onset date. (Tr. 71, 214). Plaintiff received Disabled Child allowances from June 2002 through January 2015. (Tr. 214-15). He has a tenth-grade education and has been unsuccessful in his two attempts to obtain his General Education Diploma ("GED"). (Tr. 36, 219). From 2009 through 2013, Plaintiff attended special education classes at the Jeffrey M Rapport School for Career Development. (Tr. 219). Plaintiff's 2010 Individualized Education Program ("IEP") report showed that Plaintiff's IEP included having a special education teacher, a crisis paraprofessional, a crisis intervention team, and counseling. (Tr. 207). The IEP report noted that when Plaintiff was in ninth grade, his instructional level was anywhere between fifth grade and eighth grade, depending on the subject. (Tr. 206). In school, Plaintiff was easily distracted and "require[d] a small, highly structured classroom." *Id*. There were multiple references to Plaintiff's tendency to leave the classroom to wander the halls instead of sitting through an entire class period. (Tr. 206, 207, 210).

In school, Plaintiff was able to form positive relationships with adults but used his size to bully his classmates. (Tr. 207). Plaintiff was described as acting "below age appropriate expectations" and often engaging in horseplay. *Id*. The IEP report concluded that Plaintiff lacked "social and emotional control" and that his conduct "seriously interferes with instruction." (Tr. 207, 212).

Plaintiff has no work experience and lives with his mother. (Tr. 35-36, 218-19). Following completion of his education, Plaintiff now stays at home and either watches TV or plays video

games. (Tr. 38). Plaintiff reports not having any friends and prefers to be alone. (Tr. 37-38).

Although he has a driver's license, Plaintiff rarely drives. (Tr. 35). Plaintiff does not use public

transportation, but either walks or is driven to places. (Tr. 36). Plaintiff participates in minimal

work around the house, *e.g.*, drying laundry and making sandwiches. (Tr. 38, 40).

In 2014, Plaintiff broke two televisions at home in an outburst of anger, resulting in his

mother calling the police and Plaintiff being hospitalized for observation for two days. (Tr. 42).

Plaintiff attributed the act to frustration that his car had been destroyed in a fire the day

before. (Tr. 337). Plaintiff was subsequently referred to group therapy. (Tr. 42-43).

After his Disabled Child allowances ended in January 2015, Plaintiff applied for SSI on

February 26, 2015, alleging a disability onset date of January 1, 1996 for bipolar disorder,

learning disability, insomnia, and attention-deficit/hyperactivity disorder (ADHD). (Tr. 76, 218).[2]

This application was initially denied on June 22, 2015, and Plaintiff subsequently requested a

hearing before an Administrative Law Judge ("ALJ"). (Tr. 78, 84). ALJ David Suna held a video

hearing on August 7, 2017 at which both Plaintiff, represented by a non-attorney

representative,[3] and vocational expert Pat Green provided testimony. (Tr. 26). On October 13,

2017, ALJ Suna issued his decision finding that Plaintiff was not disabled under section

1614(a)(3)(A) of the Social Security Act as of the date of application, February 26, 2015. (Tr. 10-

21). In a notice dated April 13, 2018, the Appeals Council denied Plaintiff's request for review of

---

[2] Only the facts relevant to the Court's review are set forth here. Plaintiff's medical history is contained in the administrative record that the Commissioner filed in accordance with 42 U.S.C. § 405(g). (*See* Administrative Record, dated July 28, 2018, ECF 13 ("Tr.")).

[3] Plaintiff was represented by Jasmine Ramirez, a non-attorney representative from Legal Aid. (Tr. 10, 29).

ALJ Suna's decision, rendering the Commissioner's decision final. (Tr. 1-6). Plaintiff

subsequently filed suit in this court on June 12, 2018. (ECF 2).

**B. Medical Record**

**1. Montefiore Family Health Center**

Plaintiff visited Montefiore in September 2012, complaining of insomnia. (Tr. 344-49).

The attending physician, Dr. Andrea Ritchin, marked that Plaintiff had no history of mental

illness, irritability, or mood swings. (Tr. 345). Dr. Ritchin noted that Plaintiff's primary issue was

obesity and recommended exercise and better sleep hygiene. (Tr. 349).

Plaintiff returned to Montefiore in January 2014, complaining of insomnia and

headaches. (Tr. 350). Nurse Practitioner Collette Brown saw Plaintiff and noted that Plaintiff

reported sleeping frequently during the day. *Id*. Ms. Brown agreed with the 2012 notes that

Plaintiff suffered from obesity and referred Plaintiff for a sleep study regarding his insomnia.

(Tr. 352).

**2. Bronx Lebanon Hospital Center**

On August 6, 2014, Plaintiff was hospitalized at the Bronx Lebanon Hospital Center to

undergo a psychiatric evaluation for "agitation." (Tr. 329, 337). Plaintiff's mother had called the

police after Plaintiff broke their television. (Tr. 42). Although Plaintiff was noted to have a

history of violence, he was placed as low risk for suicide or posing a violent threat to the

community. (Tr. 334-35). Plaintiff was marked to have intact attention and average intelligence,

but poor impulse control. (Tr. 334). Plaintiff was diagnosed with adjustment disorder,

prescribed medication, and discharged the next day to the outpatient facility. (Tr. 332).

### 3. Upendra Bhatt, M.D.

Plaintiff saw Dr. Bhatt from October 2014 through July 2017. (Tr. 353-54, 455-57). Dr. Bhatt, a physician with Bronx-Lebanon's outpatient psychiatry department, first saw Plaintiff on October 16, 2014 as a follow-up to Plaintiff's August 6, 2014 hospitalization at Bronx-Lebanon. (Tr. 354). Dr. Bhatt diagnosed Plaintiff with bipolar affective disorder and a learning disability. (Tr. 353). Plaintiff reported that the medication was "not helping him enough," but Dr. Bhatt felt that Plaintiff's symptoms had "diminished and stabilized." (Tr. 353-54). Dr. Bhatt agreed, however, that Plaintiff needed to continue his medication regimen. (Tr. 354).

Dr. Bhatt saw Plaintiff next on December 31, 2014 (Tr. 355). Plaintiff was diagnosed with bipolar affective disorder, learning disability, and obesity. *Id*. Plaintiff's treatment plan included reducing his anger and improving his depression. *Id*. Dr. Bhatt recommended that Plaintiff continue his medication regimen and concluded that Plaintiff's psychiatric symptoms "impair [Plaintiff's] functioning in important life areas." (Tr. 358).

At Plaintiff's February 10, 2015 visit with Dr. Bhatt, Plaintiff was warned to stop missing his doctor and therapist appointments. (Tr. 359). Dr. Bhatt noted that Plaintiff displayed no symptoms consistent with bipolar disorder and reported no mood swings or irritability. (Tr. 359). Plaintiff again was reported in both June and July 2015 to be failing in complying with treatment and attending his appointments. (Tr. 362, 364). Plaintiff's bipolar disorder symptoms were found to be in remission, but Dr. Bhatt noted that Plaintiff has difficulty reading and writing. (Tr. 365). Plaintiff saw Dr. Bhatt on February 1, 2016, at which Plaintiff again was reported to be in non-compliance with his treatment and continually missing appointments. (Tr.

373). Dr. Bhatt noted that Plaintiff's symptoms continued to be in "partial remission" and that Plaintiff reported "feeling alright." *Id*.

Dr. Bhatt completed a Report for Claim of Disability due to Mental Impairment for Plaintiff on May 27, 2016. (Tr. 381-85). Plaintiff had a GAF score of 48 and was diagnosed with bipolar affective disorder, learning disorder/intellectual disability, obesity, and impaired social functioning. (Tr. 381). Dr. Bhatt described Plaintiff's symptoms as "severe isolation," "frequent anger," "fear of crowds," and "paranoid delusions." (Tr. 382). Dr. Bhatt noted that Plaintiff was assigned to attend therapy twice a month and prescribed medication, *e.g.*, chlorpromazine, lithium, Risperdal, and gabapentin. (Tr. 383). Dr. Bhatt found that Plaintiff would have difficulty taking transportation by himself, had extremely limited ability to complete a normal workday without interruptions, had extremely limited ability to interact with the public, and had extremely limited ability to respond to changes in his work environment. (Tr. 383-84). In addition, Plaintiff had markedly limited ability to request assistance, to accept instructions, to get along with co-workers, and to adhere to socially appropriate behavior. (Tr. 384).

Dr. Bhatt saw Plaintiff on March 23, 2017, at which Dr. Bhatt repeated his opinion that Plaintiff's bipolar disorder symptoms were in "partial remission." (Tr. 436). Plaintiff reported having problems with insomnia and panic attacks. *Id*. Plaintiff did not report any psychosis symptoms or hallucinations. *Id*. At Plaintiff's April 20, 2017 visit, Plaintiff reported being on nine different medications. (Tr. 440-41).

On August 4, 2017, Dr. Bhatt completed another Report for Claim of Disability due to Mental Impairment for Plaintiff. (Tr. 388-95). Dr. Bhatt described Plaintiff's symptoms as irritability, mood swings, paranoid thoughts, anxiety, poor frustration tolerance, and a history

of learning disability. (Tr. 389). Dr Bhatt revised his evaluation from his prior report and found Plaintiff only had extreme limitations in working in coordination with others, completing a workday without interruptions, and using public transportation by himself. (Tr. 393-95). Dr. Bhatt described Plaintiff has having no significant limitations in carrying out simple instructions or in maintaining socially appropriate behavior. *Id*. Dr. Bhatt noted that Plaintiff had a "long history" of mental illness, including hospitalizations for psychiatric issues. (Tr. 395).

### 4. Betty Winkler, Art Therapist

Ms. Winkler, also affiliated with Bronx-Lebanon, began seeing Plaintiff on September 24, 2014. (Tr. 298). On March 5, 2015, report, Ms. Winkler noted that Plaintiff was cooperative, but his intelligence was below average and his reasoning and judgment were impaired. (Tr. 278). Plaintiff reported instances of fighting, anger, and poor impulse control. *Id*. Plaintiff's goals in treatment included getting his GED and getting back on SSI. (Tr. 361). Ms. Winkler commented on Plaintiff's continued failure to comply with his treatment plan and showing up late to appointments. (Tr. 279). Plaintiff reported that he used to have auditory hallucinations but no longer had any hallucinations. *Id*.

In May 2016, Ms. Winkler reported that Plaintiff seemed more stable, but still suffered from anger outbursts and severe isolation. (Tr. 316). Plaintiff reported that he feared being in crowds due to his paranoia that "everybody's looking at me." (Tr. 317). Relatedly, Plaintiff also expressed self-awareness of his mental impairments and that he was "angry all the time." (Tr. 316).

Similar to Dr. Bhatt, on May 20, 2015, Ms. Winkler completed the Report for Claim of Disability due to Mental Impairment for Plaintiff. (Tr. 305). Ms. Winkler noted Plaintiff's

symptoms were poor impulse control, frequent arguments, physical alterations, insomnia, and auditory hallucinations. (Tr. 299). Compared to Dr. Bhatt's report, Ms. Winkler reported many more of Plaintiff's abilities as being extremely limited, including ability to interact with the public and ability to understand simple instructions. (Tr. 303-05). Ms. Winkler did not mark any of his abilities as being not significantly limited or only moderately limited. *Id*. Ms. Winkler also checked off boxes stating that Plaintiff had extreme difficulty in maintaining social functioning and in ability to complete tasks in a timely manner. (Tr. 301-02).

### 5. Syeda Asad, M.D.

Plaintiff was referred to Dr. Syeda Asad for a consultative internal medicine examination by the Division of Disability Determination. (Tr. 306). Dr. Asad examined Plaintiff on May 29, 2015 and diagnosed Plaintiff with hypertension, asthma, bipolar and learning disorder, and obesity. *Id*. Whereas Plaintiff had bipolar and learning disorder from an early age, Plaintiff was diagnosed with asthma in 2005. *Id*. Plaintiff blamed his obesity for his inability to "do anything." *Id*. After finding no abnormalities in Plaintiff's physical health, Dr. Asad noted that Plaintiff had no physical limitations on his ability to work. (Tr. 309).

### 6. Sefali Bhutwala, Ph.D.

On June 19, 2015, Dr. Sefali Bhutwala, a consultative examiner, reviewed the agency's record to assess Plaintiff's condition; Dr. Bhutwala did not physically meet or examine Plaintiff. (Tr. 63-69). Dr. Bhutwala opined that Plaintiff had three severe medical impairments: asthma, affective disorders, and a learning disorder. (Tr. 64). Dr. Bhutwala did not mark any of Plaintiff's abilities as being markedly limited or extremely limited. (Tr. 67-68). Plaintiff only had one environmental limitation, as noted by Dr. Bhutwala, of needing to avoid concentrated exposure

to fumes and gases due to Plaintiff's asthma. (Tr. 66). As a result, Dr. Bhutwala advised that Plaintiff had the RFC to perform unskilled work provided that there was "low contact" and no factor that would aggravate Plaintiff's asthma. (Tr. 69).

### 7. Ruby Phillips, Ph.D.

On June 25, 2016, Plaintiff met with consultative examiner Dr. Ruby Phillips for a one-time psychiatric evaluation. (Tr. 340-43). Plaintiff reported, among other issues, difficulty sleeping, depressive symptoms, anxiety-related symptoms, auditory hallucinations, short-term memory deficit, and concentration difficulties. (Tr. 340). Dr. Phillips estimated that Plaintiff's intellectual functioning was below average, but that his concentration was intact. (Tr. 341-42). Dr. Phillips diagnosed Plaintiff with bipolar I disorder with psychotic features but ruled out an intellectual disability. (Tr. 343). Dr. Phillips agreed that her examination supported the medical record's findings of cognitive and psychiatric issues and that they may "significantly interfere with [Plaintiff's] ability to function on a daily basis." (Tr. 342).

### C. <u>Non-Medical Evidence</u>

### 1. Plaintiff's Testimony

At the ALJ hearing, Plaintiff described himself as 5'11" and weighing 300 pounds. (Tr. 35). When asked if he believed he could work, Plaintiff responded, "[s]ome days, no. Some days, yes, because one day I wake up sad and depressed so I don't." (Tr. 37). Plaintiff explained that he did not feel like working because he "just don't want to be around nobody [sic]." *Id*. Plaintiff said that his medication made him tired and sometimes panicky. (Tr. 41).

Plaintiff acknowledged that he had no additional hospitalizations other than the August 2014 hospitalization at Bronx-Lebanon (Tr. 42). Plaintiff stated that he sometimes hears voices and will "hit stuff." (Tr. 43-44).

### 2. Vocational Expert Testimony

At the ALJ hearing, vocational expert Pat Green, Ph.D., testified via telephone. (Tr. 44-53). ALJ Suna asked the vocational expert questions about a hypothetical individual of Plaintiff's age and education who is limited in the following ways: (1) no exposure to climbing ladders, ropes, or scaffolds; (2) no exposure to unprotected heights; (3) no exposure to operating a motor vehicle or moving mechanical parts; (4) avoiding frequent exposure to dust, fumes, and pulmonary irritants; (5) limited to performing simple routine tasks, but not at a production rate pace (like an assembly line worker); (6) judgment is limited to simple work-related decisions; (7) can tolerate interaction with supervisors and coworkers on an occasional basis; (8) no exposure or contact with the public other than incidental contact; (9) no teamwork-like jobs; (10) can only tolerate occasional changes in the work setting; and (11) would be off-task five percent of the time in an eight hour work day and would be absent from work one day a month. (Tr. 46-47).

The vocational expert testified that this hypothetical person would be able to perform the job of a hand packager, an assembler of small products, and an addresser. (Tr. 47). The vocational expert said that this hypothetical person would not be able to work these jobs if (a) he would be off-task for fifteen percent of the work day or (b) he was off-task for ten percent of the work day and had two absences per month. (Tr. 47-48). The vocational expert clarified that the testimony regarding acceptance of being off-task is based on her experience and not the

DOT. (Tr. 48). Upon being questioned by Plaintiff's non-attorney representative, the vocational expert opined that the same hypothetical person, if also unable to accept supervision at the work place, would not be able to find any jobs. (Tr. 49-50). Similarly, the hypothetical individual would not be employable in the three listed jobs if he required close supervision. (Tr. 51).

## III.   Analysis

### A.   Applicable Legal Principles[4]

#### 1.   Standard of Review

A motion for judgment on the pleadings should be granted if the pleadings make it clear that the moving party is entitled to judgment as a matter of law. However, the Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. Substantial evidence is more than a mere scintilla but requires the existence of "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if there exists contrary evidence. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *see also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). This is a "very deferential standard of review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court may not determine *de novo* whether Plaintiff is disabled but must accept the ALJ's findings unless "a reasonable factfinder would *have to conclude otherwise*." *Id*.

---

[4] The standards that must be met to receive supplemental security income benefits under Title XVI of the Social Security Act are the same as the standards that must be met in order to receive disability insurance benefits under Title II of the statute. *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Accordingly, cases addressing either claim are equally applicable to the issues before the Court.

**B. Determination of Disability**

To be awarded disability benefits, the Social Security Act requires that one have the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 416.905(a). The ALJ makes this determination through a five-step evaluation process, for which the burden rests on the Plaintiff for the first four steps and only after all four steps are satisfied does the burden then shift to the Commissioner for the final step. 20 C.F.R. § 416.920.

First, the ALJ must determine that Plaintiff is not currently engaged in substantial gainful activity. Second, the ALJ must find that Plaintiff's impairment is so severe that it limits his ability to perform basic work activities. Third, the ALJ must evaluate whether Plaintiff's impairment falls under one of the impairment listings in 20 C.F.R. Pt. 404, Subpart P, Appendix 1 ("Listings") such that he may be presumed to be disabled. Absent that, the ALJ must then determine the claimant's residual functional capacity ("RFC"), or his ability to perform physical and mental work activities on a sustained basis. Fourth, the ALJ then evaluates if Plaintiff's RFC precludes him from meeting the physical and mental demands of his prior employment. If Plaintiff has satisfied all four of these steps, the burden then shifts to the Commissioner to prove that based on Plaintiff's RFC, age, education, and past work experience, Plaintiff is capable of performing some other work that exists in the national economy.

**C. ALJ's Decision**

ALJ Suna issued an unfavorable decision to Plaintiff after applying the five-step process. (Tr. 12-20). After finding that Plaintiff did not engage in substantial gainful activity since the

application date, ALJ Suna noted the following severe impairments: bipolar disorder, impulse control disorder, a learning disability, asthma, and obesity. (Tr. 12-13). At step three, ALJ Suna found that Plaintiff's severe impairments did not meet the criteria of any of the Listings such that he would be considered presumptively disabled. (Tr. 13-14).

ALJ Suna then found that Plaintiff had the RFC to perform work at any exertional level but imposed the following limitations:

- Plaintiff could not climb ladders, ropes, or scaffolds;

- Plaintiff should not have exposure to unprotected heights, moving mechanical parts, or operating a motor vehicle;

- Plaintiff must avoid frequent exposure to dust, odors, fumes, and pulmonary irritants;

- Plaintiff can perform simple routine tasks but cannot be forced to work at a production rate pace;

- Plaintiff should only be given occasional changes in the work setting and should be limited to simple work-related decisions;

- Plaintiff cannot perform teamwork-type jobs, should interact with coworkers on an occasional basis, and should have incidental contact with the public;

- Plaintiff must be permitted to be off task ten percent of an 8-hour workday and must be permitted to miss work one day per month.

(Tr. 14). In making this determination, ALJ Suna gave little weight to Plaintiff's testimony of his limitations after concluding that it was inconsistent with the medical record. (Tr. 15). ALJ Suna found that the medical record showed that although Plaintiff suffered from various mental health issues, any limitations were sufficiently controlled by medication. *Id*. Because Plaintiff had not engaged in any previous relevant work, ALJ Suna proceeded to Step Five, where he concluded that there existed a significant number of jobs in the national economy that could

accommodate Plaintiff's RFC, *e.g.*, hand packager, small product assembler, and addresser. (Tr. 19-20). As a result, Plaintiff was deemed "not disabled" for purposes of SSI. (Tr. 20).

**D.  Analysis of ALJ's Decision**

Plaintiff's motion raises multiple issues with ALJ Suna's decision: (1) ALJ Suna failed to fully develop the record; (2) ALJ Suna failed to properly weigh Plaintiff's testimony; (3) ALJ Suna violated the treating physician rule by only giving partial weight to the opinion of treating physician Dr. Bhatt; and (4) ALJ Suna improperly relied on the vocational expert's testimony of available jobs, where the proffered jobs did not match ALJ Suna's hypothetical RFC. (ECF 22 at 11-24).

**1.  Duty to Develop the Record**

a.  Intellectual Disability

Plaintiff argues that while ALJ Suna found that Plaintiff's learning disorder impairment was severe, ALJ Suna erred in not investigating whether Plaintiff also had an intellectual disability. (ECF 22 at 12). If Plaintiff had an intellectual disability, Plaintiff argues, ALJ Suna should have requested a psychometric examination and requested Plaintiff's school records. *Id*. at 12-13. The ALJ has a duty to develop the record, "even when the claimant is represented by counsel or as here, by a paralegal." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). This duty is "particularly important" when the plaintiff alleges a mental illness. *Hidalgo v. Colvin*, No. 12-CV-9009 (LTS) (SN), 2014 WL 2884018, at *4 (S.D.N.Y. June 25, 2014). While the ALJ may not need to supplement the record when the record already contains sufficient evidence, the ALJ must seek out additional evidence where there are "obvious gaps' in the administrative record." *Id*. (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999)).

Plaintiff argues that ALJ Suna should have known to investigate an intellectual disability because of Plaintiff's failure to achieve his GED and his placement in special education settings while in high school. (ECF 22 at 12). Notably, Plaintiff does not point to anywhere in the medical record where there is a diagnosis of an intellectual disability, as opposed to a learning disorder.[5]

Failure to achieve his GED and being placed in special education does not create a presumption that Plaintiff suffered from an intellectual disability. Indeed, Plaintiff's school suggests a different reason. Plaintiff's school IEP report states that his disability necessitating special education was "[e]motional [d]isturbance," and explains that Plaintiff was "easily distracted." (Tr. 204, 206). Plaintiff had difficulty sitting in one place, *i.e.*, a classroom, and preferred to wander the halls. (Tr. 206). Nowhere in Plaintiff's IEP report does it indicate that Plaintiff needed special education because of an intellectual disability or a low IQ.[6]

Plaintiff acknowledges that the record does not support a finding of an intellectual disability, but argues that ALJ Suna should have ordered a psychometric examination to determine if any such intellectual disability exists. (ECF 22 at 13). Plaintiff's citation to the unpublished Second Circuit case *Aung Winn v. Colvin*, 541 F. App'x. 67 (2d Cir. 2013) (summary order) is distinguishable. In *Aung Winn*, the Court determined that once the ALJ found that the plaintiff potentially had mental impairments in addition to his physical impairments, the ALJ had a duty to develop the record as to those mental impairments. *Aung Winn*, 541 F. App'x. at

---

[5] Dr. Bhatt mentions "intellectual disability" in his May 2016 report, but that is only in reference to the "learning disorder/intellectual disability" title of the DSM-V F81.9 classification. Dr. Bhatt does not discuss an intellectual disability in his treating notes, unlike the multiple references to a learning disorder, and repeatedly refers to Plaintiff's intelligence as "average." (*See, e.g.*, Tr. 283, 314, 325).

[6] As Plaintiff acknowledges, a learning order is different from an intellectual disability. (ECF 22 at 12).

70. Here, in contrast, ALJ Suna did not ignore the alleged mental impairments, obtaining

records for, *inter alia*, Plaintiff's learning disability and bipolar disorder. ALJ Suna properly did

not address the specific impairment of intellectual disability because it was not alleged in

Plaintiff's initial application for SSI or named by Plaintiff as one of his alleged disabilities at the

ALJ hearing. (Tr. 32-33 (listing bipolar disorder, learning disability, impulse control disorder and

asthma as the "severe impairments at issue in the case")).

      Plaintiff instead appears to be arguing that once Plaintiff alleged a mental impairment,

the ALJ had a duty to investigate if Plaintiff suffered from *any other* mental impairment. (ECF 22

at 12). As discussed above, the ALJ has a duty to supplement the record where there are

"obvious gaps" in the record concerning an alleged impairment. *See Clark v. Comm'r of Soc.

Sec.*, No. 15-CV-8406 (PKC) (SN), 2017 WL 1162204, at *3-4 (S.D.N.Y. Mar. 27, 2017) (remanding

for failure to obtain complete notes from plaintiff's treating mental health professional);

*Hooper v. Colvin*, 199 F. Supp. 3d 796, 815 (S.D.N.Y. 2016) (remanding for failure to seek records

from any treating physician that dealt with plaintiff's mental impairment); *Villarreal v. Colvin*,

No. 13-CV-6253 (LGS), 2015 WL 6759503, at *21 (S.D.N.Y. Nov. 5, 2015) (remanding for failure

to investigate missing notes in treating physician's record). Plaintiff points to no case law for the

proposition that the ALJ has a duty to search for additional impairments that were never

alleged and that had no basis in the record. The record here contains extensive treatment notes

and medical source reports from Plaintiff's physicians, including from mental health

professionals. As a result, there was no need for ALJ Suna to have developed the record for an

intellectual disability, which was not alleged and was not suggested by the record.

b. Plaintiff's Testimony

Plaintiff also asserts that ALJ Suna's examination of Plaintiff failed to sufficiently follow-up on Plaintiff's answers. (ECF 22 at 18). The ALJ needs to "inquire fully into the matters at issue," which includes obtaining the necessary testimony from Plaintiff. *See* 20 C.F.R. § 702.338; *see also Bueno v. Comm'r of Soc. Sec.*, No. 17-CV-1847 (VSB) (RWL), 2018 WL 5798583, at *10 (S.D.N.Y. Aug. 20, 2018) (noting the duty to "ask[] meaningful, probing questions about [Plaintiff's] medical history and [his] symptoms").

ALJ Suna asked perfunctory questions about Plaintiff's typical day and why Plaintiff believed that he could not work. (Tr. 38-39). Although Plaintiff testified that he did not work because he preferred to be alone, Tr. 37, ALJ Suna did not ask any questions regarding Plaintiff's symptoms, *e.g.*, the nature and extent of any symptoms caused by Plaintiff's impulse control issues or bipolar disorder. The record shows that Plaintiff had a history of, *inter alia*, difficulty concentrating, hallucinations, and issues with anger management, all of which could affect Plaintiff's ability to work. (*See, e.g.*, Tr. 207, 318, 389-92). In addition, Plaintiff told Dr. Asad that his obesity made him "unable to do anything." (Tr. 306). Although Plaintiff's representative asked Plaintiff follow-up questions about his reported episodes of sadness, these questions failed to fully address the various symptoms suggested by the record.

Without obtaining Plaintiff's testimony about the intensity, persistence, and limiting effects of his symptoms, ALJ Suna could not have made an informed decision that "[plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence." (Tr. 15). Therefore, I recommend remand for

the ALJ to properly develop the record as to Plaintiff's testimony. *See Craven v. Apfel*, 58 F. Supp. 2d 172, 187 (S.D.N.Y. 1999) (remanding for failing to ask "more detailed question[s] about [Plaintiff's] psychological symptoms at the hearing"); *see also Karabinas v. Colvin*, 16 F. Supp. 3d 206, 219 (W.D.N.Y. 2014) ("it is not logical to decide a claimant's RFC prior to assessing his credibility").

### 2. Substantial Evidence

Plaintiff argues that ALJ Suna had insufficient evidence to support his findings as to Plaintiff's symptoms. (ECF 22 at 20). Although the ALJ must consider the plaintiff's subjective reports of pain and limitations, the ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). In exercising that discretion, the ALJ must determine whether the plaintiff's subjective reports of symptoms "can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence." 20 C.F.R. § 404.1529(a).

Plaintiff argues that this analysis was insufficient because (1) ALJ Suna improperly relied on Dr. Bhatt's opinion that Plaintiff's symptoms were under control; (2) ALJ Suna failed to explain why Plaintiff's symptoms did not demonstrate bipolar disorder; (3) ALJ Suna failed to explain why he gave little weight to Plaintiff's testimony on his antisocial behavior and inability to pass the GED examination; and (4) ALJ Suna failed to undertake a formal credibility assessment. (ECF 22 at 14-20). Each of these arguments will be handled in turn below.

a. <u>Dr. Bhatt's Opinion</u>

Plaintiff challenges ALJ Suna's reliance on treating physician Dr. Bhatt's notes that Plaintiff's symptoms were in "partial remission," arguing that Dr. Bhatt's opinion was "hastily made" and that ALJ Suna should have taken into account Plaintiff's fluctuation in symptom severity. *Id*. at 14-15. Plaintiff, however, does not cite to anywhere in the record that shows Plaintiff's symptoms were fluctuating or that Dr. Bhatt's opinion was not based on his treatment of Plaintiff. Rather, Dr. Bhatt's treatment notes throughout the period that he saw Plaintiff consistently state that Plaintiff's psychiatric symptoms were in "partial remission" and "have diminished and stabilized." (*See, e.g.*, Tr. 367, 373, 396, 417, 449).

I am skeptical, however, that ALJ Suna's reliance on Dr. Bhatt's conclusion that Plaintiff's bipolar disorder symptoms were in "partial remission" fully accounts for Plaintiff's other mental impairments, particularly Plaintiff's impulse control disorder. ALJ Suna acknowledged Dr. Bhatt's opinion that Plaintiff would be "extremely limited" in his ability to complete an entire workday without interruptions from his psychological symptoms. (Tr. 18). ALJ Suna gave little weight to that opinion after finding it inconsistent with Dr. Bhatt's notes that Plaintiff's bipolar disorder was in partial remission, Plaintiff no longer suffered from mood swings, and Plaintiff's concentration was intact. *Id*. These are separate, however, from Plaintiff's history of inability to control his impulsiveness and Dr. Bhatt's notes that repeatedly mention Plaintiff's anger management issues. (Tr. 207, 396, 402). For example, Plaintiff's IEP report states that Plaintiff would often attempt to leave the classroom in the middle of class. (Tr. 207). Dr. Bhatt's

treatment notes also show that Plaintiff repeatedly missed his medical and therapy appointments. (Tr. 282, 313).

Dr. Bhatt listed anger management as one of the components of his treatment plan for Plaintiff in light of Plaintiff's "poor frustration tolerance." (Tr. 362, 403). The record suggests that Plaintiff easily becomes angry when interacting with others. Plaintiff's father once threatened to call the police after an argument with Plaintiff and Plaintiff's mother did call the police in another instance. (Tr. 42, 402). Plaintiff also became angry when he was told that he would be hospitalized at Bronx-Lebanon for observation. (Tr. 337).

ALJ Suna appears to have recognized Plaintiff's limits in emotional capacity to complete a full workday because his RFC for Plaintiff includes the limitation of being off-task ten percent of the day and only having occasional contact with co-workers. (Tr. 14). It is unclear how ALJ Suna decided on these parameters when he only cites to treatment notes, both from the treating physician and consultative examiners, that say Plaintiff's attention was intact and that he was cooperative. (Tr. 16). Either ALJ Suna was persuaded by medical evidence in the record that he did not cite or he composed his own RFC limitation independent of the medical record, both of which fail the substantial evidence standard. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (noting an ALJ may not set his own expertise against a physician's). Regardless, this failure to adequately address the opinions of Dr. Bhatt, the only mental health physician who treated Plaintiff, about Plaintiff's ability to be emotionally stable for an entire workday is significant when considering the vocational expert's testimony that Plaintiff would not be employable if he could not accept supervision. (Tr. 50). On its own, it is arguable whether this is sufficient error to warrant remand, but in light of my recommendation to remand for further

development of Plaintiff's testimony, I recommend that Dr. Bhatt's opinion of ability to complete a workday without interruption be more fully analyzed when determining Plaintiff's RFC.

### b. Bipolar Disorder Analysis

Plaintiff next argues that ALJ Suna failed to sufficiently explain why Plaintiff did not suffer from bipolar disorder. This misconstrues ALJ Suna's decision. ALJ Suna found that Plaintiff suffered from bipolar disorder, and that his bipolar disorder was a sufficiently severe impairment. (Tr. 12). ALJ Suna then determined that Plaintiff was not disabled because the bipolar disorder's symptoms did not sufficiently prevent Plaintiff from working. (Tr. 19). A finding of no disability is different from a finding that Plaintiff did not suffer from bipolar disorder.

### c. Antisocial Behavior Analysis

Plaintiff argues remand is warranted because in his credibility analysis, ALJ Suna selectively ignored Plaintiff's lack of friends and failure to pass the GED while giving weight to the fact that Plaintiff was able to attend to his hygiene. (ECF 22 at 19). This conflates two issues: whether ALJ Suna should have considered Plaintiff's antisocial behavior when finding that Plaintiff did not meet the paragraph B criteria for a mental impairment under the Listings and whether ALJ Suna's assessment of Plaintiff's credibility at the RFC stage was sufficient.

ALJ Suna cited Plaintiff's ability to attend to his personal hygiene when analyzing whether Plaintiff could "manage oneself," a factor under paragraph B of the Listings. Whether Plaintiff could manage himself is different from whether he prefers to avoid contact with others. Therefore, it was not error for ALJ Suna to not consider Plaintiff's lack of friends when

assessing whether Plaintiff could manage himself. In evaluating one of the other paragraph B factors, interaction with others, ALJ Suna did cite Plaintiff's lack of friends and explained that this was not dispositive in light of Dr. Bhatt's notes that Plaintiff was cooperative in treatment sessions. ALJ Suna thus did not "fail[] to discuss" Plaintiff's lack of friends.

Nor did ALJ Suna err by omitting discussion of Plaintiff's lack of friends and failing the GED in his RFC analysis. Lacking friends and failing the GED are not themselves symptoms of impairments, but are rather potential by-products of symptoms. *See* 20 C.F.R. 416.945(c) (describing mental impairment symptoms as limitations in "carry[ing] out certain mental activities"). Factors underlying Plaintiff's failure to pass the GED, cognition and intelligence, are discussed by ALJ Suna in his references to the various medical reports. (Tr. 16-19). In addition, ALJ Suna acknowledges Plaintiff's lack of social control by imposing the limitation in Plaintiff's RFC that he can only sustain occasional contact with co-workers. (Tr. 15). Accordingly, ALJ Suna did not improperly selectively ignore Plaintiff's testimony regarding lack of friends or GED results.

### d. Specificity of Credibility Assessment

Plaintiff's final argument is that ALJ Suna failed to provide sufficient specificity when providing his reason for rejecting Plaintiff's testimony. (ECF 22 at 19-20). The Commissioner responds that after March 16, 2016, specific credibility assessments are no longer required. (ECF 25 at 3-4). While a specific credibility test is no longer required, the ALJ must still weigh Plaintiff's testimony with the evidence in the record. *See* 20 C.F.R. § 404.1529(a).

ALJ Suna's numerous references to the medical record are sufficiently specific. *See Stanton v. Astrue*, 370 F. App'x. 231, 234 (2d Cir. 2010) (warning to not "second-guess the

credibility finding . . . where the ALJ identified specific record-based reasons for his ruling"). The error lies in ALJ Suna's failure to sufficiently develop Plaintiff's testimony. As discussed above, remand is appropriate because without testimony as to Plaintiff's subjective symptoms, ALJ Suna would have been unable to properly weigh Plaintiff's testimony against the record.

### 3. Treating Physician Rule

Plaintiff next argues that ALJ Suna violated the treating physician rule by giving only "partial weight" to Dr. Bhatt's opinions. (ECF 22 at 20-21). Under the "treating physician rule," a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2);[7] *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight." 20 C.F.R. § 404.1527(c)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993). Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (c) (2)-(6); *Schisler*, 3 F.3d at 567; *Mitchell v. Astrue*, 07-CV-285 (JSR), 2009 WL 3096717, at *16 (S.D.N.Y. Sept. 28, 2009). On the

---

[7] This version of the treating physician rule applies because Plaintiff filed his claim before March 27, 2017. *See* 20 C.F.R. §404.1527.

other hand, "[t]he opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record." *Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) (summary order) (citation omitted); *see also Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 7 (2d Cir. 2017) (summary order). Similarly, the ALJ may rely on a consultative opinion where it is supported by substantial evidence in the record. *See Camille v. Colvin*, 652 F. App'x 25, 27-28 (2d Cir. 2016) (summary order); *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995).

Here, ALJ Suna assigned Dr. Bhatt's opinion partial weight upon finding that Dr. Bhatt's opinion was inconsistent with his treatment notes. (Tr. 18). Plaintiff argues that although inconsistency with the record is a factor, ALJ Suna erred in not addressing the five other factors listed above when deciding whether to grant the treating physician's opinion controlling weight. (ECF 22 at 22). Although those factors guide an ALJ's assessment of a treating physician's opinion, as long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, failure to list each particular factor is not error. *See Halloran*, 362 F.3d at 32-33; *see also Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."). ALJ Suna specifically cites Dr. Bhatt's treatment notes that show a less severe degree of symptoms than marked off in Dr. Bhatt's report. (Tr. 18-19). Accordingly, ALJ Suna did not violate the treating physician rule by failing to explicitly state each of the five factors.

### 4. Vocational Expert Discrepancy

Plaintiff further challenges the vocational expert's testimony that Plaintiff could perform the jobs of hand packager, small product assembler, and addresser, arguing that those occupations did not match ALJ Suna's RFC for Plaintiff. (ECF 22 at 24). The above occupations are classified by the DOT as requiring a reasoning development level of two, requiring the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." *Dictionary of Occupational Titles*, U.S. Dept. of Labor, 1011 (4th ed. 1991). Plaintiff argues that this exceeds ALJ Suna's RFC limitations of only being able to perform simple, routine tasks and only tolerating occasional work setting changes. (ECF 22 at 24).

Any discrepancy between the vocational expert's testimony and the DOT must be explained by the ALJ in his decision. Policy Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions, SSR 00-4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000); *see also Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 454 (S.D.N.Y. 2004) (remanding for failure to resolve a conflict between the vocational expert and the DOT). Although ALJ Suna does not address any discrepancy between his RFC for Plaintiff and the proffered available jobs, Plaintiff does not explain why "simple, routine tasks" are necessarily incompatible with reasoning level two.

The case cited by Plaintiff is distinguishable. There, the vocational expert recommended jobs requiring a reasoning level two for an RFC that expressly limited the plaintiff to "simple one or two step tasks" and "simple instructions," a description that tracked the language of reasoning level one. *See Santos v. Astrue*, 709 F. Supp. 2d 207, 212 (S.D.N.Y. 2010). In contrast,

"[w]orking at reasoning level 2 does not contradict a mandate that work be simple, routine and repetitive." *Edwards v. Astrue*, No. 5:07-CV-898 (NAM) (DEP), 2010 WL 3701776, at *15 (N.D.N.Y. Sept. 16, 2010) (citing *Money v. Barnhart*, 91 F. App'x. 210, 215 (3d Cir. 2004)); *see also Rivera v. Colvin*, No. 11-CV-7469 (LTS) (DF), 2014 WL 3732317, at *42 (S.D.N.Y. July 28, 2014) (noting most courts find that an RFC limited to "simple and routine tasks *is* consistent with GED level 2 reasoning"). Accordingly, ALJ Suna did not commit error in accepting the vocational expert's testimony regarding reasoning level two jobs.

## IV.    Conclusion

For the foregoing reasons, I recommend that Plaintiff's Motion for Judgment on the Pleadings be **GRANTED** and that the Commissioner's Motion for Judgment on the Pleadings be **DENIED**, and that the case be remanded to the Commissioner for further development of Plaintiff's testimony consistent with this Report.

## V.    Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be filed with the Clerk of Court and addressed to the Honorable Katherine Polk Failla, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Failla.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS <u>WILL</u> RESULT IN A WAIVER OF OBJECTIONS AND <u>WILL</u> PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140,

155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).


                                                  Respectfully submitted,

                                         *s/ Ona T. Wang*
                                              ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

Dated: August 22, 2019                                **Ona T. Wang**
      New York, New York                     United States Magistrate Judge